UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 12-cv-60504-SCOLA/SNOW

**FEDERAL TRADE COMMISSION,**

    **Plaintiff,**

vs.

**PREMIER PRECIOUS METALS, INC.,** *et al.*

_____/

### DEFENDANT COLUMBO'S MOTION FOR LIMITED MODIFICATION OF ASSET FREEZE TO PERMIT ACCESS TO FUNDS TO PRESERVE CERTAIN PROPERTIES, FOR BASIC LIVING EXPENSES, AND FOR ATTORNEYS' FEES AND INCORPORATED MEMORANDUM OF LAW

Defendant Anthony Columbo, by and through counsel, hereby respectfully moves this Honorable Court to modify the asset freeze imposed on Columbo's assets for certain limited and specific expenses. Recent revelations and admissions by Plaintiff reveal that there are significant reasons for this Court to reevaluate its earlier conclusions about this case, including the fact that the alleged loss to consumers is perhaps a quarter of the amount initially suggested by the FTC, the fact that undersigned has located, in the possession of the Court-appointed Receiver, taped compliance calls that refute many of the allegations made by the purported victims who submitted declarations that this Court considered in support of the FTC's motion seeking a preliminary injunction, and the fact that in a recent deposition, it has been proven that at least one of the FTC's "victim" witnesses provided materially untrue testimony in his declaration that this Court considered in support of the FTC's motion seeking a preliminary injunction. In further support, Columbo states the following.

1

1. On or about April 3, 2012 this Court entered a Preliminary Injunction [D.E. 34] against all Defendants herein, which included an asset freeze over all of Columbo's assets, including assets acquired well before any of the activities at issue in this lawsuit, and including any future assets that might be acquired by Columbo after the imposition of the asset freeze.

2. The Court subsequently modified the asset freeze to allow Columbo to receive $173 a week in unemployment compensation, and to allow him to use the proceeds of an IRA account Columbo owned that at the time had a balance of $18,946.95.  D.E. 61, 65.

3. Before the entry of the Preliminary Injunction this Court had entered an *Ex Parte* Temporary Restraining Order with Asset Freeze [D.E. 11].  The day before the entry of the Preliminary Injunction, Columbo's then-counsel moved to unfreeze assets to pay for Columbo's attorneys' fees and living expenses [D.E. 31], which this Court denied [D.E. 59].  In that motion Columbo's then-counsel sought a greater amount of living expenses than Columbo now seeks, including $12,500 per month for living expenses for Columbo's parents and his fiancée.  The instant request is much more modest, and the passage of time has resulted in a change in circumstances that, Columbo respectfully urges, merits a different result than his earlier request for funds.

4. Now, nearly a year later, Columbo is in dire straits financially.  He is unemployed despite his best efforts to obtain employment, and has been forced to accept public assistance in order to put food on the table.  *See* Declaration of Anthony Columbo ("Columbo Decl."), attached hereto as

Exhibit A, at ¶¶ 5-7.  As of the filing hereof, Columbo's unemployment benefits have run out; he now needs support even more desperately.

5. Although Columbo's elderly mother has assisted him by using her modest life savings to help pay for some of Columbo's expenses, she is unable to continue doing so; she is elderly, suffers from cancer, and does not have a lot of money.  *See id.* at ¶¶ 8-11.  In fact, the situation has forced Columbo's mother to sell her home and move in with Columbo's brother.  *See id.* at ¶ 11.

6. Columbo owns three pieces of real property that are subject to the asset freeze.  Columbo has been trying to keep up on the maintenance of these properties, including property taxes and association fees, but is no longer able to do so.  Some of the money used for maintaining the properties came from Columbo's mother.

7. Necessary expenses for these properties cost $3,690.03 per month.[1]  *See id.* at ¶ 14.  Property taxes are due now; if they are not timely paid the amount of the tax will go up.  *See id.* and attachments thereto.

8. Should the property taxes and association fees not be timely paid, the properties will no doubt end up in foreclosure.

9. The properties are currently being held in order to preserve a source of money to be used toward restitution should the FTC prevail in this action.  D.E. 34 at ¶ 5.

---

[1] Although this amount has been expressed as a monthly total, the taxes on the Pompano Beach lot and on the condominium must be paid in full, and are due now. The taxes on Columbo's homestead are escrowed and paid from the first mortgage on the property, and can thus be paid monthly.

10. Allowing the properties to fall into foreclosure does not benefit anyone, and diminishes this Court's ability to attempt to make victims whole, should that situation arise.

11. Columbo also needs basic living expenses and attorneys' fees. Columbo Decl. at ¶¶ 17, 18.

12. Columbo therefore respectfully requests that this Honorable Court release some of Columbo's frozen assets, set forth more fully below, to permit him to continue meeting the expenses of the three pieces of real property, to provide Columbo's basic living expenses, and for continued attorneys' fees in this matter.

**CERTIFICATE OF GOOD FAITH CONFERENCE**

Pursuant to Local Rule 7.1(a)(3)(A), I hereby certify that I have conferred with counsel for the Plaintiff in this action in a good faith effort to resolve the issues, and I have been advised that Plaintiff opposes this motion. I further certify that I conferred with Curtis Miner, Esquire, counsel for the Receiver in this action, who takes no position with regard to this motion.

**MEMORANDUM OF LAW**

**I.   THIS COURT HAS THE POWER TO RELEASE PREVIOUSLY FROZEN FUNDS**

Just as this Court had the inherent power of a court of equity to enter the restraining order freezing Columbo's assets, the natural corollary of that rule is that this Court has the authority to grant relief from the asset freeze. *FTC v. IAB Mkt. Assocs., LP*, No. 12-61830-Civ-SCOLA, 2012 U.S. Dist. LEXIS 151750, at *2 (S.D. Fla. Oct. 9, 2012). Because the preliminary injunction rests on the Court's equitable powers, it has

more flexibility to consider the particular circumstances of each case and to do the right thing based on the facts before the Court.

> The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between private claims.

*Meis v. Sanitas Serv. Corp.*, 511 F.2d 655, 658 n.3 (5th Cir. 1975)[2] (citing *Hecht Co. v. Bowles*, 321 U.S. 321, 329-330 (1944)).

In the instant matter, Columbo is unemployed and has no means to support himself or to pay for his defense in this matter. In *FSLIC v. Dixon*, 835 F.2d 554 (5th Cir. 1987), the Fifth Circuit reviewed a preliminary injunction that froze defendants' assets. Unlike the injunction against Columbo, the injunction in *Dixon* did not extend to newly-acquired assets, and also permitted from the frozen funds personal expenditures for the defendants of up to $3,500 per month plus reasonable business expenditures. *Id*. at 557. However, the appellate court held that the district court should modify the asset freeze to allow the release of additional funds in order to pay defendants' legal fees.

> [T]his suit was brought to establish the defendants' wrongdoing; the court cannot assume the wrongdoing before judgment in order to remove the defendants' ability to defend themselves. The basis of our adversary system is threatened when one party gains control of the other party's defense as appears to have happened here. . . . Thus we conclude that some kind of an allowance *must be made* to permit each defendant to pay reasonable attorneys' fees . . .

---

[2] All decisions of the former Fifth Circuit prior to October 1, 1981 are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981)(*en banc*).

5

*Id.* at 565 (court ruling that if a defendant was able to show he could not pay for his defense with assets not subject to the asset freeze, the district court had to make frozen funds available to permit the defendant to defend himself) (emphasis added).

## II. COLUMBO HAS NOT BEEN PROVEN TO HAVE COMMITTED WRONGDOING, AND THIS CASE IS NOT WHAT IT WAS ONCE TOUTED TO BE

Although this Court conducted a hearing on the FTC's motion for preliminary injunction, material allegations and aspects of this case have significantly changed since that time.  Even though modifying the asset freeze to allow Columbo living expenses and attorneys' fees does not require this Court to re-examine its earlier decision to impose the asset freeze in the first place, recent revelations have drastically changed the bases upon which this Court initially found that the FTC had a likelihood of success on the merits.  *See* D.E. 34 at p. 2.  For example, the FTC initially claimed that this case involved consumer losses of $9 million.  *See, e.g.,* Plaintiff's *Ex Parte* Motion for Preliminary Injunction [D.E. 6] at p. 2 ("Since 2010, Defendants have bilked consumers out of nearly $9 million.").  However, the FTC has recently conceded that the true amount of loss is much less.  *See* FTC Answers to Defendants' First Set of Interrogatories, a copy of which is attached as Exhibit B, at ¶ 20 ("Consumer injury in this matter . . . is currently estimated to be . . . $3,742,296.47").  Should the FTC ultimately prevail in this action, Columbo asserts that any final relief awarded must be limited to the amount determined to have been unjustly received by the defendants, and not the total amount of consumer loss.  *CFTC v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339, 1345 (11th Cir. 2008) ("we conclude that the district court abused its discretion in awarding the full amount of customer losses.  The proper measurement is the amount

that Appellants wrongfully gained by their misrepresentations."). Notwithstanding, there is currently approximately $3 million in frozen assets here: $1.2 million in liquidatable funds an E*trade account, and approximately $1.8 million in real property. Thus, even using the FTC's "consumer loss" amount (which Columbo contends is contrary to the law), there is nearly enough frozen to ensure a full damage award. "A district court may exercise its discretion to release frozen funds to pay living expenses or attorney fees, even in instances where the profit from the alleged wrongdoing exceeds the amount of the frozen funds." *SEC v. Petters*, No. 09-1750 ADM/JSM, 2009 U.S. Dist. LEXIS 98015, at *5-6 (D. Minn. Oct. 20, 2009) ; *see also SEC v. Dowdell*, 175 F. Supp. 2d 850, 854 (W.D. Va. 2001); *CTFC v. Noble Metals Int'l*, 67 F.3d 766, 775 (9th Cir, 1995).

Further, when this case was first brought, the FTC touted the action as halting a telemarketing operation that allegedly took millions of dollars from senior citizens, as part of the FTC's efforts to stop scammers who target the elderly. The FTC has now admitted that it has no direct evidence that proves that Defendants targeted persons over age 65. *See* FTC's Response to Defendants' First Requests for Admission, attached hereto as Exhibit C, at ¶ 11.[3]

Significantly, the defense has seriously undermined the "proofs" presented by the FTC in support of its motion for preliminary injunction, and upon which this Court relied in granting same. As this Court knows, Columbo's counsel has just recently completed an 11-week trial before this Court; that lengthy trial required the re-scheduling of most of

---

[3] Although the FTC has cleverly couched its response with the caveat that it has not reviewed all of the pertinent records, but those it has reviewed show that the majority of Defendants' customers were senior citizens and retirees, Defendants posit that a full review of all the records will reveal that the majority of customers were not senior citizens.

7

the depositions of the FTC's witnesses in this case. Also, Columbo lacks the resources to pay counsel to take numerous depositions. However, as stated above, counsel has located audio tapes in the possession of the Court-appointed Receiver in this case, which call into question many of the sworn declarations and testimony presented by the FTC. And, counsel has deposed one FTC witness, Jim Carney, whose deposition testimony materially differed from the testimony the FTC presented to this Court in support of the preliminary injunction.

### A.     Jim M. Carney

On November 30, 2012 undersigned deposed FTC witness Jim M. Carney.[4] Mr. Carney had submitted a declaration that was considered by this Court in support of the FTC's motion for preliminary injunction. *See* Declaration of Jim M. Carney ("Carney Decl."), a copy of which is attached as Exhibit E.[5] In his declaration, Mr. Carney portrayed himself as "an inexperienced investor" (*id.* at ¶ 5) who was pushed by a Premier Precious Metals ("PPM") representative into purchasing precious metals over the telephone, and who never had any idea that he would be charged certain fees. *See, e.g. id.* at ¶ 8 ("Mr. Schneider did not mention any costs or fees associated with any precious metals I might make."); *id.* at ¶ 17 ("None of this information made any sense to me, because I had never been told about any fees before I purchased the metals."); *id.* at ¶ 26 ("I was concerned that this statement showed that I was paying high commissions, interest, and service fees. I did not know what these costs and fees were for.").

---

[4] A copy of the transcript of Mr. Carney's deposition ("Carney Tr.") is attached as Exhibit D.
[5] Mr. Carney's declaration was filed as D.E. 8-2, beginning at p. 28 (or Vol. II, page 135 using the FTC's numbering on the bottom of the pages).

At his deposition, however, Mr. Carney testified that:

- At the time he invested in the precious metals at issue herein, he had a net worth of $750,000;[6]

- He had a 35-year investment history;[7]

- He was already invested in precious metals elsewhere when he bought the metals from PPM (and is still invested in leveraged precious metals transactions at least as of the date of his deposition);[8]

- He had also previously invested $700,000 in viatical insurance policies;[9]

- He was aware of risks and the possibility of price fluctuations in the precious metals market;[10]

- He regularly followed the progress of the market on his own, and watched Bloomberg daily.[11]

In his declaration, Mr. Carney claimed that he relied on representations that there was little risk involved in purchasing precious metals and that he was assured the he would make "huge profits" and "all kinds of money," (Carney Decl. at ¶ 5).  At deposition, however, Mr. Carney admitted having opened his PPM account online, and having received online documents advising him of the risk involved in the precious metals market.  For example, Mr. Carney admitted going through PPM's online sign-up process that included a detailed risk disclosure statement.  Attached as Exhibit F is a

---

[6] Carney Tr. at 14/22-15/6; 54/21-23.
[7] *Id.* at 16/15.
[8] *Id.* at 22/1-4; 54/10-16; 58/21-59/9.
[9] *Id.* at 167/6-14; 170/24.
[10] *Id.* at 38/21-23; 69/18-23.
[11] *Id.* at 103/4-104/1.

9

copy of the Risk Factors and Disclosure Statement Mr. Carney viewed online before he opened his PPM account.  Carney Tr. at 76/1-24.

Further, in his declaration, Mr. Carney claimed to have specifically told the PPM representative that he did not want to finance his precious metals purchase.  Carney Decl. at ¶¶ 7, 18.  He also claimed that he was never told of any costs or fees relating to his metals purchase.  *Id.* at ¶¶ 8, 17, 26.  He states generally that he was pressured into making this investment.  However, there were numerous tape-recorded compliance calls in which Mr. Carney acknowledged just the opposite.  Before executing Mr. Carney's first purchase with PPM on October 13, 2010, Mr. Carney received a compliance call from Mr. Columbo on behalf of PPM.  A copy of the transcript of that call is attached hereto as Exhibit G, and shows that Mr. Carney testified untruthfully in his declaration.  In the compliance call, among other things, the following exchange took place:

> Mr. Columbo:   You understand that Premier is financing up to 75 percent of the total metal value.  Your monthly fee is approximately seven-tenths percent on your financed metal; monthly service fee of six-tenths of a percent on the metal value in your account.
>
> You understand that any fees accrued would simply be added to your existing account.  You also understand that the funds include a one-time commission of 15 percent of the total metal value on this inventory.  New account fee is $200 one time.
>
> Is this correct?
>
> Mr. Carney:   Yes, sir.
>
> Mr. Columbo:   I would like to confirm that Premier Metals' equity requirements have been explained to you, and if your equity should fall below 15 percent, an equity call

> would be triggered, and you would be required to bring your equity position back up to 25 percent.
>
>           Is that understood?
>
> <u>Mr. Carney</u>:     Yes sir, I sure do.
>
> <u>Mr. Columbo</u>:     Okay, Thanks, Jimmy. I'd like to confirm that you understand this is the purchase of physical metals, not futures or options, and you may receive physical delivery of the metals if you pay the loan balance. You understand that investing in precious metals always entails risk factors, and no one guaranteed that you would make a profit, or you have not been pressured into making this investment.
>
>           Is that correct?
>
> <u>Mr. Carney</u>:     Yes sir, it is.
>
> <u>Mr. Columbo</u>:     Good. I'll execute your order, Jimmy.

Ex. G at 2/22-4/8. There are numerous taped compliance calls for metal purchases Mr. Carney made after this first one; Mr. Carney consistently acknowledged that he understood the commission that would be charged, and that the fees would be the same as they were on his first transaction.

    Thus, contrary to Mr. Carney's declaration testimony upon which this Court relied in granting the preliminary injunction, in fact Mr. Carney admitted that he was not pressured into making this purchase, he was not a novice investor, the various costs and fees were disclosed to him, and he did receive a detailed risk disclosure statement. And, at the end of each compliance call, after the customer made the requisite acknowledgments, the PPM representative advised that PPM would then execute the

transaction.  Clearly, then, the disclosures were made *before* the transactions were placed, contrary to the FTC's allegations.[12]

### B.  Lois Sargeant

Lois Sargeant was one of only two FTC witnesses who testified live at the injunction hearing in this matter.  Undersigned located taped compliance calls with Ms. Sargeant that contradict her testimony before this Court.  When she testified, Ms. Sargeant claimed that she was never told about an "equity call," and had never heard the term before.  Tr. of April 2, 2012 hearing, a copy of which is attached hereto as Exhibit H, at 16/10-16.  When asked if she had ever heard the term "leveraged investment," Ms. Sargeant testified that the PPM representative had mentioned the word, but didn't explain what it meant.  *Id*. at 16/17-20.  At the hearing, Ms. Sargeant testified that before she made her investment she was unaware that there was any risk, and had been told that there was no risk.  *Id*. at 21/9-13.  She also claimed that she was never told of any interest charges on her leveraged purchase.  *Id*. at 24/10-12.

Contrary to her testimony, the transcript of the compliance call with Ms. Sargeant on February 28, 2011 (a copy of which is attached hereto as Exhibit I), before her first purchase was executed, reveals that these matters *were* discussed with her and she acknowledged understanding them.

> Mr. Columbo:   You understand that Premier is financing up to 75 percent of the total metal value, charging you a fee, approximately, of seven-tenths percent on your financed metal, and a monthly service fee of six-tenths percent on the value of your account.
>
> Ms. Sargeant:   Right.

---

[12] *See also* Carney Tr. at 76/21-24 (Mr. Carney admitting that he received the PPM Risk Factors and Disclosure Statement before he opened his PPM account).

> Mr. Columbo: You understand that any fees accrued will simply be added to your existing account. You also understand that the funds for this trade include a 15-percent commission on the total metal value and a one-time new account fee of $200.
>
> Ms. Sargeant: Okay.
>
> Mr. Columbo: I'd like to confirm that the Premier Precious Metals' equity requirements have been explained to you, and that if your equity position should fall below 15 percent, an equity call would be triggered, and you would be required to bring your equity back up to 25 percent.
>
> Ms. Sargeant; Okay.
>
> * * * *
>
> Mr. Columbo: Do you understand investing in precious metals always entails risk factors, and that no one guaranteed you'd make a profit, and you were not pressured into making the investment? Is that correct?
>
> Ms. Sargeant: Yes.
>
> Mr. Columbo: Thank you; and we can now place your trade.

Exhibit I at 2/14-3/24. Just as with Mr. Carney, there are numerous other taped compliance calls with Ms. Sargeant in which she consistently acknowledged the commission on each transaction and that the fees charged would be the same as on her first purchase.

### C. Phillip Gillispie

Another FTC witness who testified at the preliminary injunction hearing was Phillip Gillispie. Like Ms. Sargeant and Mr. Carney, his testimony to this Court was proven untrue by the taped compliance calls.

Mr. Gillispie testified that he was promised double or triple profit. Exhibit H at 43/2-6. He claimed he was told there would be a one-time fee of 15 percent, and no other fees after that. *Id.* at 45/11-20. He testified that before he invested, no one at PPM ever mentioned the word "equity call," and he had never heard the term before. *Id.* at 45/25-46/8.

The truth, however, is vastly different. The tape-recorded compliance call before Mr. Gillispie's first transaction was executed reveals that he acknowledged that no one guaranteed he would make a profit, that he was aware that investing in precious metals was risky, and that he knew of the fees and commissions that would be charged. A copy of the transcript of Mr. Gillispie's September 30, 2010 compliance call is attached hereto as Exhibit J. Even though Mr. Gillispie testified under oath that he had never heard the term "equity call" before, in fact the compliance call discusses the equity requirements and the possibility of an equity call. *Id.* at 3/14-20.

And contrary to Mr. Gillispie's sworn testimony before this Court in which he claimed he was told there would be a one-time 15 percent fee and no other fees after that, there are 17 other taped compliance calls with Mr. Gillispie. Although on a few of the latter transactions PPM waived its commission (and Mr. Gillispie was clearly told in each such call that there would be no commission on that particular trade[13]), in every

---

[13] In fact, the first time PPM waived its commission and the representative told that to Mr. Gillispie during the compliance call, Mr. Gillispie reacted by saying "Yippee, no commission." *See* transcript of May 10, 2011 compliance call, a copy of which is attached as Exhibit K. There were 14 separate taped compliance calls before this one, and in each of them Mr. Gillispie acknowledged the commission that would be charged. That, and his reaction to this first instance of PPM not charging a commission, clearly show the falsity of his later testimony that he believed there would be a one-time charge of 15 percent and no other fees after that.

14

other call Mr. Gillispie was told that there was a 15 percent commission and that the fees would be the same as in his initial transaction with PPM.

Just as with Mr. Carney, Ms. Sargeant, and Mr. Gillispie, the taped compliance calls reveal many other inconsistencies in the testimony of other FTC witnesses whose declarations were presented to this Court in support of the preliminary injunction, and which now call the veracity of these witnesses into question.

### III.    Columbo is in Dire Financial Straits and Needs Funds Unfrozen

As set forth in Columbo's declaration, he is unemployed and has been unable to find a job. His meager unemployment benefits, which were helping him to at least survive, ended on December 28, 2012. Columbo now receives only food stamps. When undersigned counsel requested the FTC's position on freeing up some of the frozen funds to allow Columbo to survive, FTC counsel refused to agree, claiming that Columbo was able-bodied and could find work,[14] and that his mother had "a lot of money." Unfortunately for Columbo, these assertions are not true.

#### A.    This Court Should Release Money for Legal Fees and Expenses

This Court's equitable powers enable it to "mold the [preliminary injunction] to the peculiar circumstances of the case" and to fashion relief that is appropriate under the circumstances. *FSLIC v. Dixon*, 835 F.2d 554, 562 (5th Cir. 1987). Courts have often released frozen assets to enable a defendant to pay his counsel. *See, e.g., FTC v. IAB*

---

[14] Although the FTC earlier claimed that Columbo had an accounting degree, this is untrue. Columbo is a high school graduate with no higher education. Columbo Decl. at ¶ 5.

15

*Mkt. Assocs., LP*, No. 12-61830-Civ-SCOLA, 2012 U.S. Dist. LEXIS 151750, at *1 (S.D. Fla. Oct. 9, 2012); *FTC v. U.S. Mtg. Funding, Inc.*, No. 11-cv-80155-COHN/SELTZER, 2011 U.S. Dist. LEXIS 65071, at *2-5 (S.D. Fla. Jun. 9, 2011) (citing *Dixon* and ruling that the district court cannot remove a defendant's ability to defend himself by withholding attorneys' fees where there has been no final judgment establishing the defendant's wrongdoing); see also *United States v. Payment Processing Ctr., LLC*, 439 F. Supp. 2d 435, 440-41 (E.D. Pa. 2006) (fundamental fairness requires allowing defendants access to restrained assets if that is their only means to secure counsel); *SEC v. Duclaud Gonzalez de Castilla*, 170 F. Supp. 2d 427 (S.D.N.Y. 2001) (court releasing frozen assets to pay defendant's legal expenses).

In *CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766 (9th Cir. 1995), Judge Reinhardt's dissent points out that, although appellate courts have "consistently permitted district courts *to limit* or *review* the amount payable to attorneys from frozen assets before a final judgment on the merits has been reached, district courts have only been permitted to *forbid* payment of all attorneys fees in one particular class of cases [that of a criminal defendant facing a forfeiture statute]." *Id*. at 778 (emphasis in original) (internal citations omitted).

> The purpose behind freezing a defendants' assets is "to ensure that such assets are not squandered by one party to the potential detriment of another," not to prevent defendants form mounting a defense at all.

*Id*. at 779.  Here, Columbo needs money to pay for his defense.  As shown above, there are significant "cracks" in the FTC's case, it's initial allegations are no longer valid, and at least some of its important witnesses have been shown to be not credible, or at least to suffer from seriously faulty memory.  Columbo is entitled to mount a defense to the

16

FTC's allegations, but cannot do so without this Court's release of funds. Columbo therefore requests that this Court release $50,000 from the frozen assets, to be held in undersigned counsel's trust account, and to be used strictly to pay for legal fees and expenses in this matter.

### B. This Court Should Permit Payment of Columbo's Living Expenses and Monthly Expenses to Maintain the Three Pieces of Real Property

Where defendants have requested the release of frozen funds to pay living expenses, courts look to the defendant's overall assets or income. *See, e.g., Duclaud Gonzalez de Castilla*, 170 F. Supp. 2d 427, 429-30. Courts have denied requests where defendants had other sources of income, or were requesting funds for luxuries, not necessities. *See id.* (finding that the defendant had voluntarily waived receipt of a $15,000 monthly salary, and was seeking funds to pay for a nanny, housekeeper, handyman and nurse).

In contrast, Columbo seeks only funds sufficient to pay for his basic living expenses. He has detailed his monthly need for $320 for food, $200 for gas, $190 for car insurance, and $100 for medications and medical expenses. Columbo Decl. at ¶ 17. Proof of the expenses needed to maintain the three pieces of real property that are frozen are attached to Columbo's Declaration. The taxes on the empty lot in Pompano Beach and on the condominium in which Columbo's father resides are $18,922.75 (if paid by January 31, 2013; otherwise, the taxes increase).[15] If these monthly expenses are not paid, the properties risk being foreclosed upon, an eventuality that will harm not only Columbo, but also the Receivership estate and the FTC's and the Court's ability to

---

[15] The taxes on Columbo's homestead are paid from the first mortgage escrow account, and can thus be paid monthly.

make payments to consumers in this case, should the FTC ultimately prevail.  Columbo thus seeks the release of $18,922.75 now to pay the property taxes for the Pompano Beach lot and the condominium, $1,847 a month to pay the mortgages, taxes, fees and expenses of Columbo's residence, and $810 a month for Columbo's living expenses.

### IV. Conclusion

Under the facts and circumstances shown above, this Court should grant Columbo's instant request and modify the preliminary injunction to the limited extent requested.  Columbo has shown his need for the requested funds, and that he has no other ability to pay for his defense herein or to meet his basic living expenses.  The sums he seeks are reasonable and are earmarked for legitimate needs and not for luxuries.  The funds needed to maintain the real property are likewise necessary, and will ensure that the properties remain available to fund any potential financial remedy to consumers herein, if necessary.

WHEREFORE, Columbo respectfully moves this Honorable Court to modify the asset freeze currently in place to permit Columbo to maintain real property, for basic living expenses, and for attorneys' fees, as set forth above.

    Respectfully submitted,

    Malman, Malman & Rosenthal
    3107 Stirling Road
    Suite 101
    Fort Lauderdale, Florida 33312-8500
    Tel. 954-322-0065
    Fax. 954-322-0064
    Email: myles@malman.com

    By:    s/ Myles H. Malman
           Myles H. Malman
           Florida Bar No. 0776084

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 7, 2013, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: s/ Myles H. Malman
Myles H. Malman

**SERVICE LIST**
**Case No.: 12-cv-60504-SCOLA/SNOW**
**UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF FLORIDA**

Barbara E. Bolton, Esquire
Federal Trade Commission
225 Peachtree Street, NE
Suite 1500
Atlanta, Georgia 30303-1729
Counsel for Plaintiff
*Via CM/ECF Notification*

Dama J. Brown, Esquire
Federal Trade Commission
225 Peachtree Street, NE
Suite 1500
Atlanta, Georgia 30303-1729
Counsel for Plaintiff
*Via CM/ECF Notification*

Curtis B. Miner, Esquire
Colson Hicks Eidson
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Counsel for the Receiver
*Via CM/ECF Notification*